No. 33,859

F. R. COLE, *Appellee*, v. SHELL PETROLEUM CORPORATION, *Appellant.*

(86 P. 2d 740)

Opinion filed January 28, 1939.

*Albert Faulconer, Kirke W. Dale, C. L. Swarts,* all of Arkansas City, *George W. Cunningham* and *Ralph J. May,* both of Tulsa, Okla., for the appellant.

*J. T. Boyle, W. L. Cunningham, D. Arthur Walker* and *William E. Cunningham,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action by the tenant of a farm to recover damages to growing crops alleged to have been caused by obstructions placed in a natural watercourse, the Arkansas river. It was claimed the obstructions diverted floodwaters from the channel of the river and were the cause of the damage to plaintiff's crops. From a judgment in favor of the plaintiff, F. R. Cole, the defendant, Shell Petroleum Corporation, appeals.

In addition to the general verdict, the jury returned a special verdict, to which we shall refer later. Before considering the special verdict we shall narrate some of the most essential facts. Facts not now stated will be considered in the treatment of the special verdict. Where a substantial dispute exists as to the facts to be narrated now, we shall so indicate.

The rough sketch herein is not intended to constitute an exact reproduction of the maps contained in the record, but is intended to be illustrative only and to assist the reader in more readily visualizing the facts involved. The overflow of plaintiff's land, located in Cowley county, occurred during the 1935 flood. Water covered the land intermittently between the dates of May 23 and June 5, inclusive. Between those dates the water covered either a portion or most of his land for a total period of five or six days. The alleged obstructions were bridges erected by the defendant in the Arkansas river, the approaches thereto, and driftwood and debris which were accumulated thereat. Defendant had obtained an oil and gas lease from the state of Kansas, to drill for oil and gas in the bed of the Arkansas river. In the years 1926 and 1927 it drilled eight wells in the bed of that river. In the vicinity under consideration the river flowed generally in a southerly direction for some distance, and then veered to the southeast. In order to operate the oil wells defendant constructed seven pile bridges from the east bank of the river to or near the center line of the stream. One pile bridge extended entirely across the river. That bridge was the second farthest to the north. One of the short bridges, being bridge No. 1, was located above bridge No. 2, and the other six bridges were located south or below

bridge No. 2. At the end of each of the seven short bridges there was erected a lateral pile structure about fifty feet wide, which extended upstream approximately ninety feet to the well it was intended to serve. At bridge No. 2 a similar pile structure was located at the center of the bridge. That bridge was also used for the purpose of crossing the river. The upstream end of that structure was crossed and braced with planks to prevent driftwood and debris from passing under it. At the east end of each bridge there was a dirt approach or fill which extended approximately to the east bank of the river. The distance between each set of piers under the respective bridges was thirteen or fourteen feet. The distance between the bridges was about 600 feet. The sketch herein indicates the approximate location of plaintiff's land.

As early as May 13, 1935, the water in the Ninnescah river, which entered the Arkansas river from the west, was high, and a maintenance crew of the Missouri Pacific Railroad Company was at work clearing driftwood and debris from the bridges and tracks of that road. That railroad track crossed the Ninnescah river at a point south and west of the junction of the Ninnescah and Arkansas rivers. That crew continued its work on its railroad until June 30. A two- or three-inch rain fell in the territory of the Ninnescah on May 15 or 16. By May 30 a considerable portion of the tracks of that railroad had been washed away. The Ninnescah was out of its banks in that vicinity for a distance of three-fourths of a mile or more. The water drained into the Ninnescah river and then emptied into the Arkansas. The railroad of the Missouri Pacific was higher than the bank on the west side of the Arkansas. Sleigh Hill was approximately forty feet higher than the Arkansas river, and bordered that river on the west just below the junction of the Ninnescah and Arkansas. Testimony of employees of the railroad company disclosed that from Sleigh Hill water could be seen in the bottoms east of the junction of the Ninnescah and Arkansas as early. as May 16 or 17, and that such waters covered the bottoms east of the Arkansas for a distance of approximately one mile, or as far as the witness standing on Sleigh Hill could see to the east. The extent and magnitude of the water east of the Arkansas on those dates was, however, disputed by the plaintiff.

At the extreme top or north end of the sketch will be observed a ditch designated "man-made ditch or slough," which some years previous had been constructed for the purpose of carrying water, which naturally drained south, into the Arkansas river. Immediately south of that ditch a dike designated "D——E" had been constructed, and it was repaired in the year 1934. No water crossed that dike thereafter. It was constructed by a farmer for the purpose of protecting land lying south of a part of the ditch against overflow. It will be observed the dike was not extended to the east bank of the Arkansas. Beginning at a point some distance south of the north end of that dike there had been constructed in 1933 another dike marked "A——B." The letter "C" on the last-mentioned dike represents the place where water broke through it during the 1935 flood. A short distance below the south end of that dike will be observed the Winstead house. It was located about three-eighths of a mile above or north of bridge No. 1. The defendant contends water flowed south between that home and the

east bank of the Arkansas as early as May 19, and that by May 20 that water had raised and was flowing south more swiftly. There is some dispute concerning that contention, and it will be treated later. The Winsteads moved out of their home by reason of high water and were moved May 29 by Mr. Holmes, one of plaintiff's witnesses. The defendant contends the water at that time had reached within five feet of the Winstead home and reached to the east bank of the Arkansas and covered the intervening land, except for a few knolls, and that water at its deepest place ultimately reached a depth of five or five and one-half feet. There is some dispute concerning that contention, and it will be treated later. Bridge No. 1 was located about three-fourths of a mile south of the man-made ditch. It was located about three-eighths of a mile south of the Winstead house. Defendant began removing driftwood at bridge No. 1 on the 17th or 18th of May. On May 19 the government river gauge at the Oxford bridge, which was located below the junction of the Ninnescah and Arkansas rivers, indicated the river had risen to the height of ten feet, eight inches. On May 21 the gauge stood at twelve feet, seven inches, and by June 5 it had reached the flood stage of thirteen feet, ten inches. From May 16 or 17 defendant continued to remove driftwood at bridge No. 1 until May 22. The defendant claimed that on May 22, and while engaged in that work, water from the north and outside of the east bank of the Arkansas continued to flow south until it reached a point three feet high on defendant's tractor, which was located east of the bank at bridge No. 1, and that the men working on that bridge were then compelled to abandon the use of the tractor. Defendant also contends at that time no water had broken over the east bank of the river at a point 150 feet north of bridge No. 1. There was some testimony in behalf of the plaintiff no water was coming from the north at that time outside the river bank. That testimony will be analyzed later. That point 150 feet north of bridge No. 1 is emphasized at this time for the reason plaintiff contends it was the overflow of the Arkansas at that point which caused the damage to his crops. Plaintiff contends that was the first place the water overflowed the east bank above bridge No. 1. The defendant contends that while it cannot fix the exact dates for overflows of the east bank at other places, the river did overflow its east bank first at the milldam; second, at a point "X" on the east bank north of the Winstead house; third, below bridge No. 2; fourth, at bridge No. 5; fifth, at the point 150 feet north of bridge No. 1, and

sixth, between bridge No. 1 and bridge No. 2. At this place in the opinion it is sufficient to state that irrespective of the question of previous overflows at other places, it is a fact there was a substantial amount of water north of bridge No. 1, outside of the east river bank and in the lowlands east of the Arkansas prior to the overflow at a point 150 feet north of bridge No. 1. While defendant contends water did not overflow the east bank at that point above bridge No. 1, until later than May 22, it agrees we may proceed on the theory the water did overflow the east bank at that point on May 22.

The junction of the Ninnescah and Arkansas rivers is about one mile south from the junction of the man-made ditch and the Arkansas. Sand creek enters the Arkansas from the southeast at a point approximately three-fourths of a mile below the junction of the Ninnescah and Arkansas. The drainage from all of the land embraced in the instant case, lying east of the Arkansas and south of the man-made ditch, is to the south and southeast, through the lowlands and swamps, and then across plaintiff's land and ultimately back into the Arkansas river some distance south of plaintiff's land.

On May 23 approximately ten or fifteen acres of plaintiff's land was flooded. On May 30 about two-thirds of his land was flooded. The next rise, two or three days later, covered practically all of his land. During the entire period of the flood, which lasted approximately twenty-one days, some water was on his land for a total period of five or six days. The deepest water on his place was approximately two and one-half feet.

The special verdict was as follows:

"1. Did plaintiff's land overflow: (a) In 1923? Yes. (b) In September, 1926? No. (c) In 1927? Yes. (d) In 1935? Yes.

"2. Would plaintiff's land have been overflowed and his crops damaged as claimed during the 1935 flood if the structures used by the defendant in drilling and operating its oil wells in the Arkansas river bed had not been so erected and maintained? A. No.

"3. Where did the Arkansas river first overflow its east bank at or north of bridge number one (state well number 5) during the flood of 1935? A. About 150 feet north of No. 1 bridge.

"4. (a) Was the channel of the Arkansas river sufficient to carry the floodwaters of both the Ninnescah and Arkansas river below or south of their junction during the 1935 flood? A. Yes; including the secondary banks. (b) If not, did any of the surplus floodwaters go over or cover plaintiff's land? A. No.

"5. Did the defendant use ordinary care in erecting and maintaining its approaches and other structures used in drilling and operating its wells in the Arkansas river bed? A. No.

"6. If you answer the preceding question in the negative, then state in what respects defendant failed to use ordinary care in erecting or maintaining such structures? A. Failed to remove driftwood.

"7. If you answer question No. 5 in the negative, was the damage to plaintiff's crops in 1935 caused by the failure of the defendant to use ordinary care in the erection or maintenance of its approaches and other structures used in the drilling and operation of its oil wells in the Arkansas river bed? A. Yes."

Defendant first moved to have answer 1(b) and all other answers except number eight set aside upon the ground they were not supported by the evidence, but were contrary thereto. The motion was overruled. Defendant next moved to have the general verdict set aside and judgment rendered in its favor upon the special verdict. That motion was likewise overruled. The question presented here is whether the trial court erred in those rulings.

What about the objection to answer 1(b)? While there was highly substantial testimony of various witnesses the 1926 flood did overflow plaintiff's land, plaintiff testified it did not, and we shall not disturb that portion of finding number one. In passing we may, however, observe the testimony of the gauger for the U. S. Weather Bureau. This station was located at Oxford, Kan., a short distance south or below the junction of the Arkansas and Ninnescah rivers. His testimony disclosed the 1935 flood was the largest since that of 1923.

We shall treat answer No. 2 later.

The portion of question No. 3 in parentheses, we assume, was included within that question for the reason that bridge No. 1 was located at well No. 5. But just why the word "state" was also employed we do not understand. Obviously, question No. 3 did not seek information as to where along the entire portion of the river under discussion the river first overflowed its east bank. Nor can that answer be interpreted as designating the first point of overflow on the entire portion of the river concerned in this lawsuit. On the other hand, if that question and answer be interpreted, as we think it must be, namely, to include only the east bank at or north of bridge No. 1, then we still fail to see how it can stand. In view of defendant's consent, we shall assume the overflow just above bridge No. 1 occurred on May 22. Prior thereto, and on May 19, water was flowing south on the outside of the east river bank far above bridge No. 1. While the evidence was conflicting as to whether water broke out over the east bank near the point of the junction of the man-made ditch and the Arkansas, it is not disputed

that the levee "D——E" did not reach the Arkansas river. While it is contradicted by plaintiff that water came through or over the east bank of the river at a point marked "X" prior to the break just above bridge No. 1, the fact remains there was water coming from the north prior to May 22 and south of point "X," outside of the east bank. Plaintiff's own witness, Holmes, admitted water did break over the east bank of the river at point "X," far above bridge No. 1. While defendant was unable to fix the exact date for the first overflow of the east bank at point "X" or at the point "C" near the junction of the man-made ditch and the Arkansas, the fact remains a stream of water was descending from the north past the Winstead home on May 19. That was three days before the overflow just above bridge No. 1, on May 22. There was further testimony by the Winsteads, witnesses called by the defendant, that by May 20 the water had risen and was flowing south more swiftly, and that this water by May 29 had reached within five feet of their house and ultimately reached a depth of between five and five and one-half feet between their home and the center of the river. It finally reached a point eight inches high on their house. That height, however, was reached after May 22. The uncontradicted fact also remains that prior to the break in the east bank at bridge No. 1, on May 22, defendant's tractor stood in three feet of water while located outside of the east river bank. No testimony of plaintiff's witnesses was sufficient to disturb that testimony. None of them were present at bridge No. 1 at that time. Plaintiff's witness who viewed the scene at that point from a distance after the break had occurred was not in a position from which he could see the tractor or the men at work on the approach to that bridge. If he could see neither the tractor nor the men it requires no argument to demonstrate he could not see the water at that place. Nor did any evidence offered on behalf of the plaintiff alter the fact this floodwater had been passing south past the Winstead home below point "X," at least three days prior to May 22. Moreover, in view of the testimony of plaintiff's own witness, Hafer, it is not difficult to understand the presence of water east of the river bank prior to May 22, as testified to by various defendant witnesses. Plaintiff's witness, Hafer, testified:

"Q. I believe you said there was a secondary bank along the Arkansas river? A. *Lots of places there are.*

"Q. Is there any *secondary bank* up north of what you call bridge No. 1? A. No.

"Q. No secondary bank up there at all? A. There is a small bank down next to the water, probably about three feet high, if you call it a bank." (Italics inserted.)

Here, then, was the evidence of plaintiff's own witness there was no secondary bank above bridge No. 1, and only a small bank next to the water of probably about three feet high. Moreover, plaintiff's witness, Holmes, who moved the Winsteads out of their home by reason of high water on May 29, testified in substance that he noticed the water up north at about the point marked "A. H.," those being his initials, about a week before he moved the Winsteads. He also testified the water had broken through the east bank of the river at the point marked "X" and had broken the levee designated "A——B," at point "C" thereof. The exact date of that overflow is not fixed. He testified water remained on his place about thirty days. His home was east of the Winstead home. It is not claimed the water outside the east river bank far north of bridge No. 1, prior to May 22, was the result of rainfall in that region. Plaintiff's theory of the excess water within the banks of the Arkansas above bridge No. 1 is that this volume of water came down the Arkansas from upstream and above or north of the junction of the man-made ditch and the Arkansas. There is no evidence any water which was flowing south between the Winstead home prior to May 22 came across or through the levee "D——E" or over the man-made ditch west of that levee. Plaintiff's evidence is that no water overflowed that levee or ditch. Yet the water was there prior to May 22. Where, then, did it come from unless it came over the east bank of the Arkansas, far above bridge No. 1? We think defendant's motion as to finding No. 3 should have been sustained.

Answer 4 (a) clearly is tantamount to a finding the primary banks of the Arkansas were insufficient to carry the floodwaters of both the Ninnescah and Arkansas below or south of the junction of those rivers. That being true, the primary east bank of the Arkansas would have overflowed during the 1935 flood without water being diverted by defendant's bridges. Water would have covered the lowlands east of the river unless a continuous secondary bank of sufficient height prevented the overflow. Did plaintiff's evidence establish the existence of such a continuous secondary bank? We think it did not. Defendant's maps disclosing land elevation show no secondary bank east of the milldam. As a basis for this statement we are not considering the flood map of the defendant, ob-

jected to by the plaintiff. No question of competency is raised by the plaintiff in this court concerning defendant's exhibits 2 or 6, each of which discloses the absence of a continuous secondary bank east of the milldam. The land just to the east of that dam appears to be of the same low elevation as that of the surrounding lowlands farther east. From those lowlands the water naturally drained across Sand creek at the Atkins improvements and from there across plaintiff's land. The undisputed evidence of an experienced engineer, based upon measurements of both streams, was to the effect that if both the Ninnescah and Arkansas rivers were only bank full at the junction of those two streams, the capacity of the Arkansas just above the milldam was only sixty-five percent of that amount of water. But let us consider finding No. 4(a), which pertains to a secondary bank upon which plaintiff relies. We have before us not only the physical fact of the absence of a continuous secondary bank at the milldam, as disclosed by defendant's maps, but also the testimony of plaintiff's own witness, Hafer, concerning the primary east bank at the milldam. That witness admitted the east bank was low at a point just a little ways above where Sand creek empties into the Arkansas. It is true that witness further testified: "There is a secondary bank a little farther up. It is as high as the other." Whether the witness meant by "farther up," farther north or farther east is not entirely clear. We assume by "as high as the other," he was referring to the primary bank, which was low. Assuming, however, he might have meant thereby that the secondary bank there was as high as the secondary bank at other places, yet no continuous secondary bank was established. Plaintiff's own witnesses testified only to the effect the secondary bank along the east side of the river was *practically* a continuous bank. It must be obvious a secondary bank, which was not actually continuous, could not prevent floodwaters of the magnitude of the 1935 flood from overflowing the lowlands and following the natural course of drainage which led directly over plaintiff's land. Under these circumstances we might entirely ignore the facts as disclosed by defendant's maps and rely entirely upon plaintiff's evidence and still be driven to the conclusion the secondary bank did not prevent overflow during the 1935 flood. Plaintiff, however, insists some of his witnesses testified there was no overflow at the milldam. There was such testimony. Yet there was much water covering the lowlands prior to the overflow just above bridge No. 1, and as early as

May 15 and 16. Moreover, defendant's witnesses testified they witnessed the overflow of the east bank, among other places, just below the junction of the Ninnescah and Arkansas rivers, near bridge No. 5. It is true that here again some of plaintiff's witnesses testified no overflow occurred at that point, but their testimony was based upon appearances from an inspection after the overflow had occurred. The fact remains the water was in the lowlands and much of it was there before the break just above bridge No. 1 occurred. Notwithstanding these facts, the jury saw fit to find by its answer 4(b) none of the surplus floodwaters below the junction of the Ninnescah and Arkansas covered plaintiff's land. We think that finding is contrary to the evidence. The water in the lowlands, when it passed over the small stream called Sand creek, as it did in this and other floods of equal magnitude, drained directly over plaintiff's land. That was the natural course of drainage. That is a physical fact we cannot ignore.

Answers to questions Nos. 5 and 6, when considered together, as they must be, absolve defendant of all negligence as to erection of approaches and structures used in the drilling and operation of its oil wells. Answer No. 6, to wit: "failed to remove driftwood," clearly can pertain only to maintenance, and not to the subject of erection. We have previously indicated defendant removed driftwood at bridge No. 1 by the use of men and a tractor until prevented from continuing the use of the tractor by reason of the existence of water outside of the east river bank. When they were obliged to discontinue the use of the tractor the water had not overflowed the east bank just above bridge No. 1. Defendant's testimony on that point is undisputed. There is no evidence the defendant did not use proper care and caution in removing driftwood at that place prior to and at the time of the overflow. There is no evidence of anything defendant should have done in addition to that which it did do. There is no evidence that anything further defendant might have done would have prevented the overflow. In fact, that is no evidence that driftwood located at bridges or approaches at that time caused the overflow or substantially contributed thereto. The photographs showing the accumulation of driftwood pertain to conditions existing after the flood had overflowed the east bank at the various places and had inundated the lowlands, including the timber land along the east river bank above bridge No. 1, and after the flood had receded and the river had returned to its banks. Some

of the larger pieces of timber which defendant had removed from the stream prior to the overflow at bridge No. 1 were later brought back into the river by the floodwaters and were found at bridge No. 1 after the flood had receded. Obviously, the evidence of the accumulation of driftwood after the flood had ended did not establish defendant's negligence in removing driftwood prior to the overflow. Moreover, there is no evidence driftwood ever raised the river sufficiently at any time to have been the efficient and producing cause for the flooding of plaintiff's land. In other words, there is a complete absence of proof that a flood of the magnitude of the 1935 flood would not have flooded plaintiff's land in the absence of any driftwood which may have accumulated prior to the overflow. On the other hand, the evidence strongly tends to establish—if in reality it does not actually establish—the fact such overflow occurred at various places irrespective of the presence of driftwood.

What about answer No. 7? Findings must be construed in their entirety, and not separately. (*Jordan v. Austin Securities Co.*, 142 Kan. 631, 51 P. 2d 38.) What, if anything, does answer No. 7 supply? In reality it adds nothing to answer No. 6, or to the other findings, as the jury definitely fixed defendant's want of care as consisting only· in its failure to remove driftwood. On the other hand, however, if answers Nos. 7 and 5 be construed together, without regard to answer No. 6, we are still confronted with the absence of proof to support finding No. 7. The same is true of finding No. 2. The record fails to disclose plaintiff's crops would not have been damaged or that they would not have been damaged to the same extent except for the structures themselves or the structures as maintained. In fact, we think the record discloses the damage occurred independent of the structures as maintained. That being true, there could be no recovery even though it were·conceded, which it is not, that defendant had been negligent in the erection or maintenance of the structures. (See essay on "The Proximate Consequences of an Act," by Joseph H. Beale, in "Selected Essays on the Law of Torts by Harvard Law Review Association," page 734; Restatement, Torts, § 432 [1], Comments on Section 1, and Illustrations, No. 2; *Perkins v. Vermont Hydro-Electric Corp.*, 106 Vt. 367, 177 Atl. 631; *Ford v. Trident Fisheries Co.*, 232 Mass. 400; *City of Piqua v. Morris*, 98 Ohio St. 42; *Sowles v. Moore*, 65 Vt. 322, 26 Atl. 629; 21 L. R.: A. 723.) In the Perkins case, supra, it was held:

"Except where there are joint tort-feasors, tort cannot be considered legal cause of damage if such damage would have occurred had tort never been com-

mitted, rule being that in order to justify recovery negligence must form what is usually called proximate cause, but which may more accurately be termed efficient and producing cause of injury." (Syl. ¶ 4.)

"One guilty of negligence is liable for all injurious consequences flowing from his negligence, until diverted by intervention of some efficient cause making injury its own, or until force set in motion by negligent act or omission has so far spent itself as to be too small for law's notice." (Syl. ¶ 6.)

In the course of the opinion it was said:

"The principle involved is simply that of causation. Except where there are joint tort-feasors, 'a defendant's tort cannot be considered the legal cause of plaintiff's damage, if that damage would have occurred just the same even though defendant's tort had never been committed.' (Prof. Jeremiah Smith, 'Legal Cause in Actions of Tort,' 25 Harv. Law Rev. 303, 312; id., 103, 109.) In an article entitled 'Multiple Causation and Damage,' by Chief Justice Peaslee, of New Hampshire, 47 Harv. Law Rev. 1127, the learned author points out that where two causes concur in producing damage, one innocent (as, for example, the operation of natural forces) and the other guilty (as, the doing of a negligent act), and each is of itself sufficient to work the injury without the concurrence of the other, there should be no liability. 'So long as the innocent cause is in actual, inescapable operation, before the wrongful act becomes sufficient, it is not apparent how the latter can be considered the cause of the loss. Causation is matter of fact, and that which is in fact causal ought to be deemed so in law' (page 1130)." (p. 380.)

Furthermore, had there been substantial evidence the structures as erected and maintained actually contributed to the amount of plaintiff's damage, we still, under the record, would be left entirely to speculation and conjecture as to the probable extent to which they contributed. In that respect the record is entirely silent. Judgments resting on mere surmise, conjecture or speculation will not be permitted to stand. (See various kinds of cases collected in *Hogan v. Santa Fe Trail Transportation Co.*, 148 Kan. 720, 727, 85 P. 2d 28, in which the rule has been applied.)

In view of the conclusions reached as to the evidence and the special verdict, it becomes unnecessary to discuss the various authorities cited by the respective parties. In view of what we have said, it follows that neither the special verdict nor the general verdict can stand. The judgment is reversed with directions to enter judgment for the defendant.

·Mr. Justice HUTCHISON heard the argument, participated in a conference, but retired from the bench before the opinion was written.