No. 35,642

Grace C. Taggart, *Appellee,* v. Yellow Cab Company of Wichita, and Mary Alice Weckel, *Appellants.*

(131 P. 2d 924)

Opinion filed December 12, 1942.

*I. H. Stearns* and *Arnold C. Todd,* both of Wichita, argued the cause, *E. P. Villepigue* and *Kurt Riesen,* both of Wichita, were on the briefs for the appellants.

*George Siefkin,* of Wichita, argued the cause, and *Robert C. Foulston, Samuel E. Bartlett, Lester L. Morris, George B. Powers, C. H. Morris* and *John F. Eberhardt,* all of Wichita, were on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action to recover damages for personal injuries resulting from a collision between a taxicab and another automobile. It was instituted by Grace C. Taggart, a passenger in a taxicab, against the Yellow Cab Company of Wichita, and Mary Alice Weckel, the driver of the other car. Plaintiff prevailed, and both defendants appeal.

Two general questions are presented. The first is whether plaintiff was entitled to recover against both defendants. The second is whether the verdict was excessive.

We shall refer to the appellant, Yellow Cab Company of Wichita, as the Cab company. The collision occurred at the intersection of Rutan avenue and Second street in the city of Wichita. The intersection was approximately thirty feet square and located in a residential district. There were no stop signs at the intersection. The taxicab in which appellee was a passenger was traveling south on Rutan avenue. The appellant, Weckel, was driving east on Second street. The two vehicles collided near the center of the intersection. The points of contact between the vehicles were at the rear and left or north side of the Weckel car and the front of the taxicab. Appellee was thrown out of the west door of the taxicab and onto the pavement.

Both appellants filed motions to set aside certain findings of fact made by the jury, motions for judgment *non obstante veredicto* and motions for a new trial, all of which were overruled.

We shall first consider the contentions of the Cab company. Its motion to set aside certain findings of fact was based upon the ground such findings were contrary to the evidence. We shall discuss only such findings as are now challenged and treated in its brief, on the assumption it has abandoned its complaint concerning other findings originally included in its motion. At this point it may be well to state appellee does not contend the negligence of the

Cab company consisted in violating the speed ordinance of the city of Wichita, which we are told was twenty-five miles per hour, but she does contend the driver of the Cab company did not exercise the necessary degree of care to avoid colliding with a speeding car which was approaching the intersection from the west and which the driver of the cab could have seen long before reaching the intersection if he had exercised the degree of care required of persons who transport passengers for hire. The jury found the taxicab entered the intersection at fifteen miles per hour and was traveling seven miles per hour at the time of collision. The Cab company contends there was no evidence which specifically fixed those two speeds at exactly fifteen and seven miles per hour. It therefore insists the findings constituted guesswork and should have been set aside. While we find no evidence which specifically fixed the speed at exactly those miles per hour, the evidence was such that appellant cannot claim reversible error upon that ground. One of plaintiff's witnesses testified the cab passed him about 150 feet north of the intersection, and that the cab was then traveling approximately twenty miles an hour; that as it got down to the intersection it slowed up, and that it started up again when the Weckel car came shooting out on Second street going east. The same witness also testified a conservative estimate would be that the speed of the taxicab did not exceed twelve miles per hour. From the record before us it is not clear whether that was the witness' opinion of the speed at which the taxicab entered the intersection or at the point of collision. The driver of the taxicab testified he had been driving south on Rutan at about twenty miles per hour and was driving about ten miles per hour when he had entered the intersection about three feet, and that he was still moving a little at the time of the impact. The appellant, Weckel, testified she saw the cab coming prior to the collision and that she would say it was going between twenty and twenty-five miles per hour. These findings of the jury were fairly within the range of the testimony, and the refusal of the court to set them aside did not constitute reversible error, and that is especially true under the circumstances in this case. As heretofore stated, it was not so much the exact speed at which the cab was being operated as the failure to keep a proper lookout in time to stop the cab that caused or contributed to bringing about the collision. The cab driver, as we shall presently show, could have looked west for some distance before he reached the intersection and could

have seen the Weckel car coming if he had looked. Among other things the cab driver testified:

"I looked west just as I started to enter the street. I didn't look west from the time I cleared the house and could see down to Holyoke until the front wheels of my car started to enter Second street. I am familiar with the city ordinance that provides that the parties on the right had the right of way, and it was my duty to clear for cars coming on my right. I didn't do that. I didn't see her coming. She must have been there. She was still down the street when I was at the intersection."

The Cab company and the appellant, Weckel, complain of finding No. 6, which was that Mrs. Weckel was traveling thirty miles per hour when she entered the intersection and at the time of the collision. There was evidence she was driving 35 miles per hour, at least 35 miles per hour, and other evidence she was traveling about 25 or 30 miles per hour. Manifestly, we cannot disturb that finding.

The Cab company complains of finding No. 10, which was that the cab driver did not see Mrs. Weckel coming from the west *before* he entered the intersection. There was an abundance of evidence to support the finding, including the cab driver's own testimony. In determining the correctness of a ruling on a motion to set aside findings of fact we are concerned only with evidence which supports or tends to support the findings and not with testimony contrary thereto. The cab driver's explanation for not seeing Mrs. Weckel's car prior to the time he entered the intersection was that cars parked along the north side of Second street obscured his view.

The Cab company also argues now that certain special findings were inconsistent with each other and that they should have been set aside and that its motion for a new trial should have been granted for the same reason. The contention that some of the findings were inconsistent with each other was not alleged in either of its motions and of course the contentions cannot now be considered on appeal.

In its motion for judgment *non obstante veredicto,* the cab company asserted: (1) the special findings conclusively show the Cab company was not guilty of negligence: (2) the special findings conclusively show the proximate cause of the injuries was the negligence of the defendant, Weckel; (3) the general verdict was contrary to the special findings; (4) the special findings were in part contrary to the evidence, and (5) the special findings, pleadings and evidence show conclusively that the verdict should have been for the Cab company, notwithstanding the general verdict.

Point No. 4 has been treated. Points Nos. 2, 3 and 5 will be discussed later. Our first concern is with contention No. 1. The special findings were:

"1. Do you find the defendant, Yellow Cab Company of Wichita, Inc., guilty of negligence? A. Yes.

"2. If the answer to the foregoing question is in the affirmative, then state in what such negligence consists. A. Failure to use highest degree of care and skill upon entering intersection.

"3. Do you find the defendant, Mary Alice Weckel, guilty of negligence? A. Yes.

"4. If the answer to the foregoing question is in the affirmative, then state in what such negligence consists. A. (1) Excessive speed; (2) carelessness while entering intersection.

"5. What was the speed of the taxicab (a) as it entered the intersection? A. 15 miles per hour. (b) At the time of the collision? A. 7 miles per hour.

"6. What was the speed of Mary Alice Weckel (a) as she entered the intersection? A. 30 miles per hour. (b) At the time of the collision? A. 30 miles per hour.

"7. State the location of the car driven by Mary Alice Weckel at the time the taxicab entered into the intersection. A. 25 feet west of intersection, of Second street and Rutan.

"7-A. State the distance the Weckel car traveled after the collision. A. 80 feet.

"7-B. State the distance in which the cab could have been stopped traveling at the rate of speed it was going when it entered the intersection. A. 30 feet.

"7-C. State the location of the taxicab at the time of the collision, with reference to the center of the intersection of Rutan and Second streets. A. Front of cab two feet south of center line of Second street and one foot west of center line of Rutan.

"7-D. State the location of the Weckel car at the time of the collision, with reference to the center of Rutan and Second streets. A. Front of Weckel car 8 feet east of center line of Rutan street and 3 feet south of center line of Second street.

"8. State the distance the taxicab traveled after the collision. A. 15 inches.

"9. Did Foster, the driver of the taxicab, look to the west before he entered the intersection? A. Yes.

"10. Did the cab driver at any time before he entered the intersection see Mrs. Weckel coming from the west? A. No.

"11. If he had looked before entering the intersection, how far could the driver of the cab have seen Mrs. Weckel approaching, when he was:

100 feet north of the intersection? A. 100 feet.
75 feet north of the intersection? A. 130 feet.
50 feet north of the intersection? A. 300 feet.
10 feet north of the intersection? A. 600 feet.

"12. If the cab driver had looked just before entering the intersection, would he have been able to have stopped before the collision? A. No."

For the purpose of obtaining a ruling on a motion *non obstante veredicto*, the special findings are admitted to be supported by evidence. (*Montague v. Burgerhoff*, 152 Kan. 124, 127, 102 P. 2d 1031; *Haney v. Canfield*, 152 Kan. 597, 106 P. 2d 662.) Do the special findings compel the setting aside of the general verdict against the Cab company? In other words, do the findings affirmatively show the driver of the cab was guilty of no negligence which caused or contributed to bring about the collision? By finding No. 1, the jury found the Cab company was guilty of negligence. The Cab company, contends finding No. 2 constitutes a mere conclusion. It also interprets that finding as pertaining solely and alone to the act of the cab driver at the precise point where the intersection actually begins. It therefore contends no other findings which purport, or tend to support, negligence on the part of the cab driver can be considered. The jury probably got the words "failure to use highest degree of care and skill" from language employed in the instructions. The instructions are not before us and are not challenged. Standing entirely alone the quoted words might be regarded as a conclusion, and yet we believe the jury intended thereby to convey the thought that the driver of the cab was not as careful, with respect to protecting his passenger for hire, as the instructions of the court required him to be. The true purpose of special findings is to serve as an aid in the difficult process of administering justice and not as a means of circumventing it. We need not, and in fairness cannot, shut our eyes to other specific findings which amplify or tend to illuminate a general finding of negligence. (*Montague v. Burgerhoff*, supra, pp. 127-128, and cases therein cited.) We think findings Nos. 1 and 2 are amplified by other findings. It is true the cab driver was not traveling at a high rate of speed, according to the findings of the jury. But the jury also found that at the low rate of speed he was traveling when he entered the intersection, it required thirty feet to stop. With such lack of ability to stop he clearly could not have stopped until he had completely crossed the entire intersection, irrespective of how great the calamity facing him in the intersection might have become and, in this case, did become. The Weckel car was coming from the west at the rate of thirty miles per hour. The jury found the cab driver looked west just before he entered the intersection, but that he did not see the Weckel car coming. The jury, however, also found he could not have stopped the cab in time to avoid the collision if he had looked

just before entering the intersection. The jury also expressly found he could in fact have seen the Weckel car approaching on Second street at various points, ranging from 100 to 600 feet west of the intersection, if he had looked west from various points on Rutan avenue before he reached the intersection. We think findings Nos. 1 and 2 are amplified by these other findings. We think all of them considered together are clearly open to the interpretation that the jury meant the cab driver could have seen the Weckel car approaching from the west in ample time, had he looked, to have enabled him to stop the cab before the collision and that it constituted negligence for him to enter the intersection without having looked west sooner and oftener than he did. It is always the duty of courts to harmonize special findings with the general verdict if reasonably possible to do so. (*Montague v. Burgerhoff*, supra.) Where special findings are susceptible of more than one interpretation courts adopt the interpretation which is in harmony with the general verdict. (*Claggett v. Phillips Petroleum Co.*, 150 Kan. 191, 195, 92 P. 2d 52.) The general verdict must be permitted to stand unless the special findings clearly overthrow it. (*Jordan v. Austin Securities Co.*, 142 Kan. 631, 649, 51 P. 2d 38; *Montague v. Burgerhoff*, supra.) In this case the special findings do not compel a disturbance of the general verdict against the Cab company. What has been said disposes not only of point No. 1, but also of point No. 3, and that part of point No. 5 which pertains to the special findings. Point No. 5, however, referred not only to the special findings but also to the evidence generally. It is necessary to touch upon only one other feature of the cab driver's negligence which is not specifically covered by the special findings. He testified, "I did not stop my car before entering the intersection, notwithstanding the fact my vision was obstructed by cars standing at the curb." Irrespective of the absence of a stop sign, it manifestly was his duty, if his view was obstructed, to have stopped or to have slowed down sufficiently to have enabled him to avoid colliding with the other car. He did neither and his negligence contributed to the resulting collision. Appellee testified the cab driver, at the place of collision, told her:

"I saw a woman coming up the street but I just supposed—coming up there fast, speeding, or something, but I just supposed she would stop."

In view of such evidence the general verdict against the Cab company could not have been set aside.

This leaves for consideration contention No. 2, that the special

findings conclusively show the proximate cause of the injury was the negligence of the appellant, Weckel. The latter appellant makes the same identical contention against the Cab company. The contentions relative to the subject which appellants denominate as "proximate cause" will be treated after considering other contentions of the appellant, Weckel.

The appellant, Weckel, moved to have various findings which showed, or tended to show, negligence on her part set aside. In the view we take of this case it is unnecessary to review her various contentions with respect to all of those special findings. It is sufficient to say that if her motion in most respects had been sustained, the general verdict could not have been set aside. Findings Nos. 3, 4 and 6, which are among the findings challenged, would in themselves prevent setting aside the verdict. Under the contentions of the Cab company we treated finding No. 6 and concluded it was abundantly supported by the evidence. We need not repeat what was said there concerning specific evidence to support the precise speed per hour which was found by the jury, but in that connection see *Claggett v. Phillips Petroleum Co.*, supra, p. 194. We are told the speed limit at this intersection was twenty-five miles per hour. The jury expressly found her negligence consisted in (1) excessive speed; (2) carelessness while entering intersection. The appellant, Weckel, contends the latter finding was a pure conclusion. It is not contended the finding of excessive speed was a conclusion and it must stand. While the word "carelessness" in the second finding of negligence is not a specific finding, the words "while entering intersection," do indicate a definite location which the jury meant to emphasize with reference to the conduct of the appellant, Weckel. It indicates the jury meant to indicate some fault in addition to speed, because the jury expressly separated that fault from the negligence of speed by giving it a separate and distinct number. No one can read appellant Weckel's own testimony without realizing what the jury had in mind. She testified in part: She saw the cab when she was 50 to 100 feet west of the intersection; she did not put her foot on the brake but took it off of the accelerator; the cab was within her view all of that time; she did not see the cab go into the intersection and did not see it after it got into the intersection. Later she testified she did not observe the taxi driver after she got one-fourth of the way into the intersection. In view of this record and the specific finding of excessive speed, the court would

not have been justified in setting aside the general verdict even though it had set aside the finding of "carelessness while entering intersection."

This brings us to the motion of the appellant, Weckel, that her motion *non obstante veredicto* should have been sustained. The principles of law applicable to that motion, stated under the same contention of the Cab company, apply here and need not be repeated. Clearly the findings, considered in their entirety, do not compel the setting aside of the general verdict against the appellant, Weckel, and the trial court properly overruled that motion.

Both appellants insist if any liability was established, the proximate cause of the collision was the negligence of the other appellant. Both, therefore, seek to escape liability. They speak of proximate cause, which is probably more accurately termed "legal cause" or "the efficient and procuring cause." (*Cole v. Shell Petroleum Corp.,* 149 Kan. 25, 37, 86 P. 2d 740.) In any event, neither of those causes nor "degree of culpability," is the yardstick by which liability of joint tortfeasors, to an innocent third party, is measured in actions such as this. The measuring device is concurrent negligence. It is apparent the acts of neither appellant alone would, or could, have caused the collision. Furthermore, the extent of injury occasioned by the negligence of each appellant is indivisible. The real question is, therefore, whether the concurrent negligence of appellants contributed to the collision and resulting injury. (*Tilden v. Ash,* 145 Kan. 909, 67 P. 2d 614, and cases therein cited.) See, also, *Neiswender v. Shawnee County Comm'rs,* 151 Kan. 574, 577, 101 P. 2d 226; *Hughes v. Pittsburgh T. Co.,* 300 Pa. 55, 150 Atl. 153; *Carlton v. Boudar,* 118 Va. 521, 88 S. E. 174. Such negligence was clearly established and the tortfeasors are jointly and severally liable for the entire damage. In *Tilden v. Ash,* supra, similar in principle, we held:

"Substantially concurrent negligent acts of two or more persons render all liable as joint tortfeasors where the act or acts of each contribute to the injury. In such circumstances the degree of culpability of each is immaterial and each is liable for the entire damage." (Syl. ¶ 2.)

The case of *Hughes v. Pittsburgh T. Co.,* supra, is very much in point. There, plaintiff, a passenger in a taxicab, was injured when a streetcar collided with the cab. It was held:

"Where an injury would not have occurred if there had not been concurrent negligence, the subject of proximate cause need not be considered; those whose acts united in producing the injury will be held jointly and severally liable to the injured party" (Syl. ¶ 5.)

In the opinion of the Pennsylvania case it was said:

"The question involved here is one of concurrent negligence and not of proximate cause; hence the latter need not be considered. In *O'Malley v. P. R. T. Co.*, 248 Pa. 292, 294, we said: 'The negligence of which the jury found the Philadelphia Rapid Transit Company guilty was the dangerous rate of speed at which its car was moving up Twentieth street; but this negligence, in itself, resulted in no injury to the plaintiff. The negligence of which H. A. McCleman & Brother were convicted was the failure of the driver of their wagon to observe proper care in driving across Twentieth street as the car was approaching it from the south; but this negligence of the driver, in itself, caused no injury to the plaintiff. What injured him was the collision, which was the direct result of the combined negligence of the two defendants, and for the immediate consequences of what they jointly brought about, they are, and ought to be, jointly accountable, even though the plaintiff might have sued them separately, joint wrongdoers being liable both jointly and severally.' " (p. 59.)

It is argued by the Cab company and suggested by the appellant, Weckel, that the verdict in the sum of $8,004.75 is excessive. The material facts in this connection, in substance, were: Appellee was a chiropractic doctor, having practiced since her graduation in 1924. She was engaged in the practice on the date of her injuries, January 10, 1941. Immediately following the accident she was removed to the Southwest Osteopath Hospital in the city of Wichita, where she was under the care of Dr. John Hubert Walker, until March 14, 1941. She had a T-shaped fracture of her right leg, and the fracture went across, involving both condyles. There was a split down the middle of the bone, with some dislocation of the fragments. It was a very mean fracture. The bone did not heal while she was in that hospital and she decided she wanted another doctor. She was removed to the Wichita hospital, where she was under the care of Dr. Charles Rombold and his assistant, Dr. Harry O. Anderson. The latter was an orthopedic surgeon. The examination at the latter hospital disclosed a severe comminuted fracture of the lower end of the femur, the thigh bone. It was broken in several pieces and the break extended into the knee joint. A slight healing had taken place at that time but such healing was broken up and the fracture was realigned in the proper position and held together by plates and screws. The wound was closed and a cast applied which remained until April 21, when that cast was removed and another cast was applied which remained for four weeks. During this period appellee remained almost flat on her back. She left the Wichita hospital June 27, 1941. The fracture had united but she had very little mo-

tion through the knee joint. She made satisfactory progress by August 13, but she retained definite limitation of motion in the knee. There was testimony the leg would be two-thirds stiff. The knee injury was permanent and the extent of leg disability was 25 percent. The leg was shortened about one-half inch. She complained most of pain in the lower back, in the location of the sacroiliac region. Doctor Anderson testified he was unable to demonstrate that she had or did not have an injury in the back; he attributed the pain in that region to arthritis; he thought she would be able to walk with the use of a cane, although she would limp a little; the leg shortage was from a one-fourth to one-half inch and she could eliminate the limp, in part, by having her shoe lifted. When she left the Wichita hospital in June they advised she continue with physicotherapy.

Dr. C. P. Huey testified, in substance, he was a graduate chiropractor and had practiced for twenty-eight years. He treated her while in the Osteopathic hospital on an average of three times a week. The shortening of the leg was three-fourths of an inch. He thought the sacrum had slipped about one-fourth of an inch. He found a severe abscessed condition in the rectum. From an X-ray examination they concluded the sacroiliac bones were displaced. The leg deficiency was permanent. The sacroiliac slip was subject to correction over a period covering from one to two years. His professional treatments began in June, and he was treating her at the time of the trial. He believed she could perform none of her duties as a chiropractor at that time. She was progressing under his treatments.

In addition to some of the facts already related, appellee in substance testified when she left the Wichita hospital she had a nurse for six weeks. After that a school girl attended her. At the time of the trial she could get around fairly well on crutches but it was difficult to get up and down. The pain was mostly in the lower part of her back and she could take only a few steps with crutches. The pain was in the sacroiliac region. In her work as a chiropractor she had to stand and lean over the table and had to be on her feet a good deal. She tried to make an adjustment for her nephew a week before the trial but was unable to stoop over. She could do some dusting in her home with a mop by using one crutch. She could stand and wash dishes but could not carry them with the use of one crutch. She had suffered an injury to her shoulder in a car

accident on December 29, 1940, and on the occasion of the instant collision she was on her way to the hospital to get an X ray of her shoulder. Except for the shoulder injury her physical condition was splendid and she had been able to do all of her chiropractic work. She was sixty years of age and her income from her practice was about $100 per month.

The testimony further disclosed she had a life expectancy of 14.1 years. Her actual doctor and hospital expenses prior to trial had been $1,804.73.

It will be observed that at the time of trial appellee had already lost over $1,200 of earnings, which together with hospital and medical expenses in the sum of $1,804.73, made a total loss of $3,004.73. This left $5,000.02 of the verdict to compensate for pain and suffering, future care and treatment and loss of future earnings. Her present earnings, if continued over the period of her expectancy, would amount to $16,920. It is, of course, true that appellee probably would not have been able to maintain that earning capacity during her entire life expectancy. ' While she had suffered only about a 25 percent disability in the flexibility of her knee, it is also clear that she was unable at the time of trial to properly perform even her ordinary housework and certainly was entirely unable to carry on her professional duties. Exactly how long such disability would last is not clear. But an allowance of loss of present earnings for only five years would amount to $6,000. That would be approximately $1,000 more than the balance of $5,000.02, without any allowance for other items mentioned above. We must assume the jury took all of these factors into consideration in determining the amount of its verdict.

Appellants direct our attention to the case of *Martin v. Kansas City,* 150 Kan. 927, 96 P. 2d 646, in which the verdict was reduced. The excessive verdict was there traceable, in part, to improper and persistent efforts in plaintiff's behalf to keep the insurance feature before the jury. The case is not in point. Our attention is also directed to other cases in which we have held verdicts to be excessive. It is unnecessary to engage in a lengthy discussion of the detailed facts and circumstances in these various cases. After all, every decision must rest upon its own peculiar facts and circumstances. A scientific method for measuring damages with unerring certainty and accuracy has not yet been, and probably never will be, devised. Neither can all the decisions of courts, with respect to

the allowance of damages, be perfectly harmonized by the method of comparison. The human mind just simply is not that accurate. While we might have approved a smaller verdict in this case, it does not follow that we therefore would be justified in setting aside the instant verdict. If the verdict is out of line at all, it is not sufficiently so to shock our conscience and we will, therefore, not disturb it.

It is also urged appellee's physical condition was not all due to the collision. It was, of course, the duty of the jury to consider her previous physical condition, but the record does not indicate it failed to do so.

In view of what has been said, appellants' motions for a new trial were properly overruled.

The judgment is affirmed.