No. 39,885

CARRIE STROHMYER, *Appellee,* v. SAM VENTURA and LLOYD E. HINTON, *Appellees,* and ROBERT BOGART; A. B. WACKNOV, LEONARD WACKNOV, ALEX D. WACKNOV, and PAUL WACKNOV, doing business under firm name and style of THE AMERICAN WIPER AND WASTE MILLS, *Appellants.*

(290 P. 2d 1000)

Opinion filed December 10, 1955.

*John E. Blake,* of Kansas City, argued the cause, and *Bill E. Fabian* and *Robert E. Fabian,* both of Kansas City, and *Sam Sebree, Edgar Shook, David R. Hardy,* and *James H. Ottman,* all of Kansas City, Mo., were with him on the briefs for the appellants.

*Leonard O. Thomas,* of Kansas City, argued the cause, and *Lee E. Weeks* and *Willard L. Phillips,* both of Kansas City, were with him on the briefs for the appellees.

The opinion of the court was delivered by

ROBB, J.: This was an appeal by a joint tort-feasor from the verdict and judgment of the trial court in favor of the widow of the deceased in a wrongful death action.

For the purpose of simplifying our references to the various parties and the vehicles involved, they will be referred to as follows:

Carrie Strohmyer as appellee; Sam Ventura as Ventura; Lloyd E. Hinton as Hinton; the truck owned by Ventura and driven by Hinton as the Hinton truck; Robert Bogart as Bogart; the truck owned by the Wacknovs and driven by Bogart as the Bogart truck; A. B. Wacknov, Leonard Wacknov, Alex D. Wacknov, and Paul Wacknov as the Wacknovs; George Strohmyer, an employee of the state highway commission, as the deceased; the state of Kansas maintenance and highway truck as the highway truck; and Oscar Edwards, also an employee of the state highway commission, who was with the deceased in the highway truck, as Edwards.

The issues in the case were made up by the second amended petition, the answer of Hinton and Ventura, the answer of Bogart and the Wacknovs, and the reply. Since there is no question here involving those pleadings, it is not necessary to set out the allegations thereof.

This action involved a series of collisions. In the first collision the front left part of the Hinton truck, which was loaded with sand, collided with the right rear of the Bogart truck, which was loaded with waste material. As a result of this collision, the Bogart truck was catapulted into two workmen who were engaged in fixing a defect in the road surface immediately behind a parked highway truck. The Bogart truck continued on, collided with, and came to rest at the left rear of the highway truck. As a result of the Bogart truck striking the deceased, who was one of the two men repairing the roadway, deceased received injuries which resulted in his death.

In the trial negligence and resulting liability on behalf of Hinton

and Ventura were admitted, but it was denied that the brakes of the Hinton truck were faulty or that the truck was overloaded.

We have condensed the statement of facts, which facts were clearly established by the testimony of witnesses, as follows:

On March 31, 1953, at approximately 1:40 p. m., a highway truck was parked headed in a northerly direction just north of a defect in the road and in the middle of the west or inside lane of the two northbound lanes of traffic of the four lane north and south roadway called Seventh street in the Fairfax district of Kansas City; the weather was cloudy, but the roadway was dry; at this point Seventh street was fifty-four feet wide and was intersected by Funston, an east and west road fifty-four feet wide, and by a third street, Industrial boulevard, which ran northwest and southeast; these two intersecting roads reached a dead end at Seventh street; some distance north from this intersection was Sunshine road which ran east and west and intersected Seventh street; on the northwest corner of Sunshine and Seventh streets was the Sunshine Biscuit Company. The Bogart truck, a three quarter ton pickup truck with a load of 1,000 pounds, was proceeding north on Seventh street to make a delivery to the Sunshine Biscuit Company, which would have necessitated a left turn at the corner of Sunshine road and Seventh street; as the truck came over the crest of a railroad overpass about 750 to 800 feet south of where the highway truck was stopped, Bogart who was traveling about twenty-five miles per hour, saw the truck and also the two men repairing the defect in the pavement, which caused him to slow down to fifteen miles per hour; Bogart testified that he did not need to swerve to either side to miss the highway truck or the two men; there was some question as to whether Bogart was in the east or west lane of the northbound traffic because he stated in his testimony that he was on the inside or west lane, but in his report to the investigating officer he said he was "in the right most lane," which would have been the east or outside lane. In his report Bogart stated he planned to pass the truck on the right side. Bogart further testified:

"Q. Is it possible you are mistaken about the lane you were in, and that you were in the right most lane, as you told the officers? A. I was in the inside lane, next to the center line of the highway.

"Q. Where was this truck [referring to highway truck] sitting? Was it parked over to the center of the road? A. It was parked mostly over to the other side of the highway.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. And that is approximately in the center of the street? A. The patch was. But the truck seemed to be parked more to the right, or to the west of it.

. . . . . . . . . . . . . .

"Q. What was your reason for looking in your rear vision mirror when you were a hundred feet from the intersection? A. Just noticing.

"Q. Was it because you knew you were going to have to get out of the lane you were traveling in, but you wanted to be sure it could be done with safety? A. I was in the same lane, but I don't remember if I stayed in that lane up until I got to 7th Street and Sunshine Road before I had to make a left hand turn."

The mirror referred to by Bogart was not the commonly known rear vision mirror generally located in the center of the windshield, but a mirror to the side of him as he sat in the driver's seat.

Bogart further testified:

"Q. Then what if anything did you do? A. Then I put my foot on the brake.

. . . . . . . . . . . . . .

"Q. How long did you travel with your foot on the brake? A. Until I got to the corner.

"Q. So you had your foot on the brake from the time you were two hundred feet from the top of the hill till you got to the corner? A. Yes, sir.

. . . . . . . . . . . . . .

"Q. Your car in gear, and your foot was on the brake for a distance of four hundred feet. A. Yes sir."

We are not concerned with any liability on the part of Ventura because this was admitted as is shown by the opening statement of counsel, which was in part as follows:

". . . and I want to say to you right now that Mr. Ventura does not excuse the action of his driver Hinton . . . He does not now and has never refused to pay a share of whatever damages are rightfully accruing to Mrs. Strohmyer . . ."

but in order to complete the circumstances, we must refer to acts of Hinton as he drove the truck. Hinton was not present and, therefore, did not testify at the trial, but a witness, Mr. Ginn, who was a passenger in the Hinton truck, did testify.

Charles Floyd Ginn, who had previously known Hinton for about a year, had met him that morning when he had stopped for a traffic light; Hinton offered Ginn a ride in the Hinton truck, which was loaded with sand. (We might note at this point it was stated in Ventura's testimony that the load of sand weighed 14,200 pounds which, together with the weight of the Ford 1950 F6 dump truck, made an over-all weight of 21,600 pounds.)

Proceeding with Ginn's testimony, we learn that a number

of stops were made and Hinton mentioned that his brakes were not too good; Ginn saw the Bogart truck eighty feet ahead traveling north on Seventh street as the Hinton truck came over the slope of the bridge traveling thirty to thirty-five miles per hour; when the distance between the Bogart and Hinton trucks narrowed down to about thirty-five feet Bogart was going at a pretty low speed; no signal by lights or arm was seen but Ginn believed he would have seen it if one had been given; Bogart did not slow down all of a sudden and he did not change his position in the highway; Hinton applied his brakes, but they did not slow down the truck too much; the right rear of the Bogart truck was struck by the Hinton truck.

Cross-examination of Ginn showed that he could not tell the exact speed of the Bogart truck, but he thought that it was going less than ten miles per hour at the time of the first collision; Hinton had tried to swerve to the right after the brakes didn't hold; the Bogart truck never came to a rapid stop, but it did come to a rapid slowing down; Ginn could have seen the highway truck if he had been paying attention, but he had not seen it.

A deputy sheriff established the width of the intersection of Industrial boulevard and Funston road as 104 feet; skid marks eighty-six feet in length led to the Hinton truck, which had stopped fifty-eight feet east of the highway truck and the Bogart truck; Strohmyer's body lay just to the left or west of the left rear wheel of the highway truck.

Another deputy sheriff testified that the first impact between the Hinton and the Bogart trucks was about even with the south line of Industrial boulevard where it intersected Seventh street; this was a distance of about 104 feet from the point of impact between the Bogart truck and the highway truck; he also established the distance across the intersection from the south line to the north line where Funston and Industrial entered Seventh street as 104 feet; Bogart appeared to him to be dazed at first but he was satisfied that Bogart knew what he was doing when he made his statement; the Bogart truck was a 1948 Chevrolet and had made no skid marks on the pavement; by reason of the impact the Bogart and highway trucks moved forward slightly and stopped fifty-four feet from the center of the intersection; the center of the intersection was fifty-two feet from the south line of Industrial boulevard, or a total of 106 feet; it was 106 feet from the point of the first impact to the point of the second, which showed the force of the collision.

A highway patrolman who did not arrive at the scene until 2:15 p. m. corroborated the deputy sheriff's testimony and added that at twenty-five miles per hour a vehicle would travel 37.5 feet per second; that reaction time, which is the time between the time danger is discovered and the application of brakes, is about three fourths of a second, during which a vehicle may travel a little less than thirty-three feet; at thirty-five miles per hour a vehicle would travel 51.3 feet per second.

The testimony further disclosed than Seventh street was U. S. highway 69 and was heavily traveled.

At the close of plaintiff's evidence, defendants Bogart and Wacknovs demurred thereto and the demurrer was overruled. At the close of all the evidence, Bogart and Wachnovs moved for a directed verdict, which was also overruled.

The court instructed the jury by setting out the parts of the petition as they affected Bogart and were pertinent to special findings of the jury as follows:

The negligence and carelessness of Bogart in that prior to the collision of the Bogart and Hinton trucks, Bogart had turned his vehicle aside from its direct course of travel without first ascertaining whether it was safe to do so; and in failing to give any signal of his intention to stop or turn aside immediately preceding the collision between the Bogart and Hinton trucks. The instructions set out certain statutes, the pertinent parts of which were:

"Whenever any roadway has been divided into three or more clearly marked lanes . . . (a) A vehicle shall be driven as nearly as practical entirely within a single lane . . . until the driver has first ascertained that such movement can be made with safety. . . ." (G. S. 1949, 8-542.)

"(a) No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety . . . or after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement. (b) A signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning. (c) No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided. . . ." (G. S. 1949, 8-547.)

"All signals herein required to be given by hand and arm shall be given from the left side of the vehicle . . . (3) Stop or decrease of speed—hand and arm extended downward. . . ." (G. S. 1953 Supp. 8-549.)

In short, the court further instructed that if the statutes quoted were violated in such a manner as to amount to negligence, then the jury should find such party or parties violating them to be

guilty of negligence, but that such negligence must be proved by a preponderance of the evidence that it was a proximate cause of the collision and injury. The burden of proof was upon plaintiff to prove by a preponderance of the evidence that Bogart was negligent, which concurred with the admitted negligence of Hinton, and that as a direct result of such concurrent negligence the collision whereby deceased was injured occurred between the Hinton and Bogart trucks, and that unless the jury so found, Bogart and Wacknovs would not be liable and only Hinton and Ventura would be liable.

Continuing the pertinent parts of the instructions, the jury was told that if they found as a direct result of the first collision Bogart was so dazed that he was physically or mentally unable to control his vehicle as it was impelled toward the deceased, then their verdict should be in favor of plaintiff, Bogart and Wacknovs, and against Hinton and Ventura. If, on the other hand, the first collision was caused by one or more acts of concurrent negligence on the part of both drivers, or Bogart was not so dazed by that collision that he could not control his vehicle, and acting as a reasonably prudent driver would under the same or similar circumstances, he could or should have avoided striking the deceased, then the verdict should be for plaintiff and against all the defendants.

The trial court instructed generally and fully on every element in the case, but we are constrained not to burden the record with all of them, especially in view of the answers of the jury to special questions submitted to it, which were:

"1. Was the defendant Bogart guilty of negligence which caused or directly contributed in causing the truck operated by Hinton to strike the rear of the truck operated by Bogart? A. Yes.

"1-A. If the answer to the foregoing is in the affirmative, state the acts of negligence committed by the said defendant Bogart. A. In failing to give any signal of his intention to stop or turn aside.

"2. Was defendant Bogart so dazed by reason of his truck being struck from the rear by the defendant Hinton's truck, that he was thereby caused to be unable to regain control of his truck before it struck the deceased? A. Yes.

"3. State whether defendant Bogart committed any act of negligence in the operation of his truck after his truck was struck in the rear by defendant Hinton's truck. A. No.

"3-A. If your answer to the foregoing is 'Yes,' then set forth the act or acts of negligence committed by the defendant Bogart after his truck was struck by said Hinton's truck. A. _____."

The jury returned its verdict finding generally for the plaintiff and against all the defendants in the sum of $15,000.

Defendants Bogart and Wacknovs filed a motion for judgment notwithstanding the general verdict in favor of them because under the special findings of the jury, the plaintiff was not entitled to recover against Bogart and Wacknovs, and they were, therefore, entitled to judgment; that the special findings No. 1 and 1-A were unsupported by the evidence; and that the special findings No. 1 and 1-A were not negligence as a matter of law, not the proximate cause of the injuries to deceased, and were not the acts of negligence which caused or contributed to the collision of the Hinton and Bogart trucks as a matter of law.

Defendants Bogart and Wacknovs filed a motion for a new trial which included nineteen grounds. However, the only ones urged by these defendants were that the court erred in (1) overruling defendants' demurrer to the evidence; (2) refusing to give a peremptory instruction to return a verdict for defendants; (3) overruling defendants' motion for judgment under the special findings; (4) overruling defendants' motion that special findings No. 1 and 1-A were unsupported by the evidence; and (5) overruling defendant's motion that the special findings of the jury were inconsistent with the general verdict. This motion was overruled.

Hinton and Ventura also filed a motion for new trial and it was also overruled. Judgment based upon the general verdict of the jury was entered in favor of plaintiff (appellee) for $15,000 against all defendants.

Notice of appeal was filed on February 25, 1955, in which the same matters were included as those in the motion for a new trial with the additional ground that the trial court had erred in overruling defendants' motion for a new trial. The appeal was from the judgment, order, and verdict. The same notice of appeal was again filed on March 2, 1955. The specifications of error were that the court erred in overruling (1) the demurrer of defendants Bogart and Wacknovs to plaintiff's evidence; (2) their motion for a directed verdict; (3) their motion to strike special findings; (4) their motion for judgment notwithstanding the general verdict; (5) their motion for a new trial, and finally, (6) by entering judgment against them.

We shall consider the specifications of error in order. The first related to the overruling of appellants' demurrer to the evidence

of appellee. In determining whether the evidence of negligence on the part of appellants was sufficient as against a demurrer, all of appellee Strohmyer's evidence had to be considered as true by the court; only that part favorable to her, together with all reasonable inferences to be drawn therefrom could be considered and any unfavorable to her had to be disregarded. Such evidence is not weighed as to any contradiction or difference between the direct or cross-examination and if when properly considered, there is any evidence to sustain plaintiff's case, the demurrer should be overruled. (*Tuggle v. Cathers,* 174 Kan. 122, 127, 254 P. 2d 807; *Nolan v. Hebrew,* 177 Kan. 363, 278 P. 2d 1011, and cases therein cited.) When put to the above test we think the record showed sufficient evidence to take the case past a demurrer on Ginn's testimony. Therefore, the trial court did not err in overruling the demurrer.

We agree with appellants that the mere circumstance an accident happened and someone was injured, standing alone, will not support a verdict, but we believe the facts and circumstances appearing in this record, together with the evidence of Ginn and Bogart, were sufficient, substantial and competent to show Bogart's negligence not only in failing to give a signal that he was going to stop or turn aside, but also that this could not be done safely, as is required by statute. We think this justified the overruling of the motion for a directed verdict. Since appellants did not stand on their demurrer, any evidence which they introduced that may have supplied any lack in appellee's proof, will be considered in determining the correctness of the order overruling the demurrer (*Tuggle v. Cathers,* supra, p. 127) and certainly in this case the evidence supplied by Bogart could be considered by the court on the motion to direct a verdict for appellants.

While appellants were correct in their contention that the law does not require a person to do a useless thing, we cannot agree with appellants that Hinton was not looking and would not have seen a signal had one been given because the record disclosed that Hinton did not testify and his report to the officers did not disclose any such fact. To the contrary Ginn stated that he could have seen a signal if one had been given. However, Ginn saw none and in addition, Bogart testified that he had put his foot on the brake for at least 400 feet while he was coming down the hill. Hinton had finally noticed that Bogart was slowing down and had tried to apply his brakes, but they hadn't held when Ginn saw Hinton trying to

apply his brakes eighty-five feet back of Bogart. We might mention that nowhere in the record before us was it contended Bogart ever gave a signal nor that he ever knew Hinton was back of him, which is borne out by the fact that he looked in the side mirror and saw no one behind him and then kept watching the highway truck and the two men working on the roadway.

No two cases of negligence are congruent in the facts and circumstances and while many authorities were cited by the parties, we do not feel it is necessary to refer to all of them because many of them are quite dissimilar to the case at bar. This is an unusual case and we might say that the facts are highly controversial. Reports of both drivers to the officers at the time showed the Bogart and Hinton trucks in the rightmost lane, while at the trial the evidence of Bogart and Ginn had both trucks next to the center or in the inside lane. The jury was justified not only in answering the special questions as they did, but also in rendering the general verdict in favor of appellee. The special questions were squarely on the issues and there was evidence to support them and since the jury based its conclusions and findings on that evidence, this court will not disturb the special findings and general verdict.

Appellants drew a very fine distinction that in order for the answers to special questions No. 1 and 1-A to be harmonized with the petition would mean that the signal was not made immediately before the collision. We cannot agree with this. Had Bogart signaled at the time he applied his brakes some 400 feet from the point of the collision, it would certainly have given notice to Hinton so that he could have done something. However, when Hinton noticed Bogart was slowing down, he was only eighty-five feet away from Bogart, was traveling 51.3 feet per second, and he did not have as much time to apply his brakes. The record showed that the brakes on the Hinton truck caused skid marks from the point of collision to the place where it stopped after the first impact. We think this further weakens appellants' contention that it would have been useless to require Bogart to give a signal under the circumstances.

Furthermore, on the motion for judgment *non obstante veredicto* the special findings were admitted to be supported by the evidence. A jury's findings are to be considered in their entirety with a view of ascertaining the jury's intent. (*Taggart v. Yellow Cab Co. of Wichita*, 156 Kan. 88, 131 P. 2d 924.) Here in the over-all picture

the jury found definitely in favor of appellants on the proposition that after the first impact they were no longer guilty of negligence because Bogart was dazed.

What appellants would like to have done in this case is for this court to determine that since they were only slightly negligent, they are not liable, but this court said in *Taggart v. Yellow Cab Co. of Wichita,* supra, that as between joint tort-feasors the degree of culpability is immaterial where their concurrent negligent acts contribute to the injury of an innocent third party.

We do not have an inconsistency here between the general verdict and the special findings. In fact, they are consistent and there is no reason for setting aside the general verdict or rendering judgment for appellants notwithstanding the general verdict in view of what has been said about the facts and circumstances.

In conclusion, we find there was no error on the part of the trial court in overruling the motion for a new trial and in entering judgment against appellants.

The judgment is affirmed.

HARVEY, C. J., dissents.