No. 36,022

JAMES C. DAVIS, *Appellee*, v. THE KANSAS ELECTRIC POWER COMPANY, *Appellant*.

(152 P. 2d 806)

Opinion filed November 4, 1944.

*Lee Bond,* of Leavenworth, and *Raymond F. Rice,* of Lawrence, were on the briefs for the appellant.

*John H. Murray, Jesse A. Hall, William H. Biddle* and *Joseph J. Dawes,* all of Leavenworth, were on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for damages for personal injuries sustained by plaintiff and for property destroyed or damaged as a result of an explosion and fire in his undertaking establishment in Leavenworth, alleged to have been caused by defendant's negligence in permitting natural gas to escape from its mains and get into the basement of his building. The jury answered special questions and returned a verdict for the plaintiff for $13,695, upon which judgment was rendered. Defendant has appealed and contends that the court

erred, (1) in overruling its demurrer to plaintiff's evidence; (2) in refusing to set aside answers to certain special questions; (3) in overruling its motion for judgment on· the answers to the special questions notwithstanding the general verdict, and (4) in the admission of testimony and in giving and refusing certain instructions. Defendant also questions whether plaintiff was entitled to recover for property damages for which he had been reimbursed by insurance, and whether he was entitled to recover damages for personal injuries in the amount awarded by the jury.

Many of the facts are not seriously controverted, and these may be ˉsummarized as follows: Plaintiff had lived in Leavenworth about seventy years, and for the last thirty-five years had been engaged in the undertaking business on his own account, prior to that time having worked with his father, who was an undertaker. At the time in question he was conducting his undertaking business in the building which he had owned about thirty years, located at the southeast corner of Sixth and Shawnee streets in Leavenworth. This was a two-story brick building, with a tin roof, situated on two lots, and faced north on Shawnee street. The first floor contained office rooms, the mortuary, a chapel for conducting funerals, and rooms for the friends of the deceased, and for other purposes common to an undertaking business; was well furnished, and otherwise equipped for a modern undertaking establishment. Plaintiff spoke of it as a funeral church. There was a basement under the building divided into two rooms, each approximately twenty-four feet wide by ninety feet long, separated by a solid stone wall, with the exception of an opening about eight feet wide, for which there was no door. This basement was reached by a stairway from the office. In part of the south end of the west room was a space for a coal furnace, with which the building was heated, and this was separated from the other part of the basement by a solid brick wall. One of these basement rooms was used as a display room for caskets and other material used in the business, and the other as a storage place for caskets and other undertaking paraphernalia. The north end of each room had been partitioned off as a closet for the storing of some of the equipment, and a part of each of these closets extended out under the sidewalk. To the south, or rear of the main building, was a building spoken of as the annex. This was constructed with brick walls, independent of the walls of the main building. This building was used for compounding embalming fluid and for other purposes in connection with the business. The defendant company

furnishes natural gas for use of the inhabitants of Leavenworth, having a total of about sixty-five miles of pipe of various sizes. It had a three-inch gas main which ran east and west about the center of Shawnee street, which was connected with supply lines at Third, Fifth and Sixth streets. This pipe was made of cast iron, with nine- and twelve-foot sections, making about forty-five joints in a block. Plaintiff used natural gas for water-heating purposes. Defendant supplied that gas from its gas main in Shawnee street by a pipe directly from the gas main to plaintiff's building, the meter being set in the areaway of the closet of the east room to the basement, from which there was a pipe to the ceiling of the basement near the stone partition wall back to the rear of the main building and the annex. Plaintiff obtained water for his use from a water main which was laid north and south in Shawnee street several feet north of defendant's gas main. This water main was about four feet under the pavement, perhaps a little deeper than defendant's gas main. The water service pipe came from the water main into the west basement room of plaintiff's building, the meter being set in the areaway of the closet of that room, with the cut-off under the sidewalk. Originally this service pipe was a two-inch pipe. At some time prior to the explosion a leak had developed in the service pipe and the leak was stopped by putting a one-inch pipe inside the two-inch pipe which was already in the ground, and the one-inch pipe was connected to the water main at one end and to the meter at the other. From the meter water was piped to the parts of the building or annex where plaintiff desired to use it. Apparently plaintiff did an extensive business. He seems to have had as many as three men working in his employ, and there were two bodies in the mortuary at the time of the explosion. On the morning of January 1, 1941, plaintiff went to his office about nine o'clock, or a little earlier. At least two of his employees were there. One of them started to the basement and turned on the electric switch at the head of the stairs, which would light the basement. This was followed immediately by an explosion—the central force of which appears to have been at the north end of the west basement room—so severe that it raised the floor of the office perhaps six inches, broke glass in the windows, threw a plate glass window across the street, and did serious damage to the building. Plaintiff was thrown down in such a way that he sustained personal injuries. A fire followed immediately. Plaintiff, or his employees, got the two bodies out of the building and called the fire department, which was several hours extinguishing

the fire. The result was serious damage to the building and loss or damage to its contents. We need not recite these property damages, for aside from the amount allowed by the jury for plaintiff's personal injuries there is no controversy over the amount of the verdict if plaintiff is entitled to recover.

In plaintiff's petition the defendant's negligence alleged may be summarized as follows: That on January 1, 1941, and for three months prior thereto, defendant, its officers, agents, servants and employees negligently, carelessly and knowingly permitted gas to escape from the gas main along Shawnee street in front of plaintiff's property, and knew, or by the exercise of reasonable diligence could and should have known, that the gas main was old, defective beyond repair, and that natural gas was leaking therefrom in large quantities; but notwithstanding the same the defendant, its officers, agents, servants and employees negligently, carelessly and knowingly permitted the natural gas to escape from the mains, and negligently omitted to exercise diligent efforts to repair the main or to safeguard the property of persons along Shawnee street, and that the defendant, its officers, agents, servants and employees knew that the natural gas was highly explosive and dangerous and would explode or burn when coming in contact with any flame or spark. It was further alleged that without fault on plaintiff's part the explosion and resulting fire occurred because of defendant's negligence; that the actual cost to repair the buildings was $10,876.66; that the damage to the contents thereof was $8,074.70, and that plaintiff suffered personal injuries to his damage in the sum of $2,500. The prayer was for judgment for $21,451.36.

The answer admitted plaintiff's ownership of the building and personal property and that defendant was engaged in the business of furnishing natural gas as alleged, but specifically denied "that it or its officers, agents, servants or employees knew, or by the exercise of due diligence, could have known that gas was escaping from its main along the street at a point near the plaintiff's property, but alleges that it at all times used due diligence in laying, inspecting and maintaining its gas mains, service lines, and all other parts of its gas distributing system in a safe manner, and that it used due diligence to discover if gas was escaping, and whether a reasonable basis to anticipate damage actually existed in its said system, and that none was discovered." It further alleged that if there were any defects or leakage in defendant's gas distributing system near plaintiff's premises the same were unknown to defendant, and that de-

fendant made diligent and adequate inspection of its system for the purpose of discovering any leaks or escaping gas, and that by due and proper care and diligence defendant was unable to and did not discover any escaping gas or leaks as alleged in plaintiff's petition. Defendant further alleged that plaintiff's property was insured in various insurance companies in the sum of $21,000, and upon proof of loss the companies paid him the sum of $13,387.13, and that plaintiff delivered to the companies his receipt therefor and signed an instrument subrogating all his rights to said sum to the insurance companies, and that plaintiff is not now entitled to recover that sum, or any portion thereof, for his own use and benefit, "but if entitled to recover said sum or any part thereof, which this defendant denies, the same can be recovered solely and only for the use and benefit of said insurance companies." There was a further plea of contributory negligence. Plaintiff filed a reply consisting of a general denial.

We will now take up the questions argued by appellant. Did the court err in overruling its demurrer to plaintiff's evidence? Plaintiff testified to the ownership of the building and the contents, and described those at some length; that there was an explosion and fire January 1, 1941, and testified to the extent of the damage. He further testified that he went to his place of business on the morning of January 1, 1941, between eight and nine o'clock; that the night man reported there was supposed to be gas in the building, so he turned around and called the defendant company. Nobody answered, and after waiting a few minutes he called again and got no reply. He started out of the office. At that time one of his employees who was in the office turned the switch for the light downstairs and the explosion occurred.

Clarence E. Moulden, an employee of plaintiff's, among other things testified that about the first of October, 1940, Karl Heim, an employee of defendant, came to plaintiff's place of business and asked that the gas be turned off at the meter and gave as a reason for it that they were testing the main; that he saw two other employees of defendant and Heim go out in Shawnee street near the east line of Sixth street and dig a hole down to the gas main· and cut a hole in the pipe and attach something like a meter to it. The witness testified that he heard Heim say "it was leaking at the rate of 156 cubic feet per hour," and a little later Heim said, "It was quite a leak, that the gas company paid forty cents a thousand for it"; that the witness was about plaintiff's establishment every day, and that he did not see defendant opening up the street until a

week or two before Christmas, when they started coming up from Fifth street to Sixth street putting in a new main. The new main, which was put in in December, was next to the curb near the south side of the street. There was evidence also that on October 1, 1940, there was a permit issued to defendant to open and close the paving at Sixth and Shawnee streets to test the main on Shawnee by making two holes there. On the same date permits were issued for excavating at other places in the city; that on December 4, 1940, a permit was issued to defendant for gas service between Fifth and Sixth streets on Shawnee. That was for the new main. There was testimony that this new main was put in in front of plaintiff's business a few days after Christmas, 1940.

H. C. Allen, called as a witness by plaintiff, testified that he was a chemistry teacher at the University of Kansas and had been a professor of chemistry at the University for about thirty years; that his education had included undergraduate work and graduate work for Master's and Doctor of Philosophy degrees. On January 4, 1941, at plaintiff's request, he went to plaintiff's building in Leavenworth for the purpose of seeing if anything might be found in a chemical way to indicate the cause or reason for the fire that had taken place in that building; that he took samples of material from two different places in the building; that he was interested in samples of gas; that in the west basement room, near the north end and on the west side of the room, there was a good-sized crack in the wall, where the mortar had dropped out. He took a glass tube and put it in this crack as far as it would go and took samples of gas from that location. That sample was taken by filling a bottle with water and inverting it over a pan of water, then running a rubber tube in the bottle and allowing the water to run out, which sucked the gas into the bottle. Then in the north wall of this basement room there was a sleeve which ran through the wall; a larger pipe and inside this was a smaller one which left an opening between these two pipes and ran it back fifteen inches or two feet, and by the same way got a sample of gas from this sleeve. The witness took these samples to the University and analyzed them, but before returning to Lawrence he took from a gas jet in another building a sample of gas supplied by defendant to its customers in Leavenworth. The sample from the west wall, the first sample mentioned, was analyzed and proved to be entirely air, practically pure air. The sample from this sleeve going through the north wall analyzed carbon dioxide

1.31; oxygen 9.14; methane 8.80; ethane 1.97; nitrogen or residue 78.78. Methane and ethane are the inflammable or explosive elements of gas. The witness, with a sample from that sleeve, tested its explosive powers. The sample as taken from the sleeve did not explode. When mixed with an equal volume of air it would explode. It would not explode unless air was mixed with it, because 9.14 percent oxygen, as reported in this particular sample, was not enough for it to explode. You would have to add air to natural gas to get it to explode. The sample of Leavenworth gas was analyzed by the witness and its composition was carbondioxide .16; oxygen, none; methane, 75.92; ethane, 15.14; residue, 8.78. The witness testified that evidently from the fire the explosion was in the front part of the west basement room, right up in the vicinity of the water sleeve; that he did not see any evidence of an explosion back in the furnace room or in the laboratory. Answering other questions, the witness testified that he would say that the condition there, that is, the gas there, and the general condition in that part could have caused the explosion. The witness further testified:

"I don't hardly believe I want to say definitely it did. I say it could. . . . Well, I believe I would say that probably was the cause of it. This condition in the front part of the basement room there. The fact you have an open sleeve there. That is perfectly, definitely, a way for gas to get into the room; and actually finding the gas there that could have come into the room."

The witness was asked:

"Could you give us an idea about how long you think the gas was coming in, in order to get enough in the room to explode? A. It would depend upon entirely on the pressure outside, how fast it was coming in. . . . Well if there was any pressure back of it—if there was any leak in the outside there which would cause pressure of course the gas could not help but come out."

There was further testimony to the effect that there was no leakage about the gas pipe as it came into the building, or the meter, or the gas pipe as it went back through the building, or the water heater; that there was no evidence of any explosion about the water heater or about the coal furnace, nor in the annex where the embalming fluid was compounded, or in the mortuary part where it was used; that the embalming fluid consisted of formaldehyde and other ingredients which were not explosive.

Neither plaintiff nor any of his employees had noticed gas in the building prior to the morning of the explosion, when the night watchman advised plaintiff that there was supposed to be gas in the building. After having discovered the extent of the gas leaking

from the main in the center of Shawnee street on the morning of October 1 defendant had not cautioned plaintiff that there might be gas leaking into his building or basement. Many other items of the evidence introduced on plaintiff's behalf might be noticed, but we think what we have said sufficient.

There is no controversy here over the well-settled rule that in passing upon a demurrer to the evidence the court must give plaintiff the benefit of all reasonable inferences to be drawn from the evidence in his behalf, and is not justified in weighing the evidence. Applying that rule here we think the court correctly overruled the demurrer to the evidence.

Appellant points out plaintiff had alleged the main gas pipe in Shawnee street was an old pipe, had been there many years, and that there was no evidence in plaintiff's case bearing upon how long it had been there. Apparently that is a matter well known to both parties, for defendant not only in its opening statement but by its first witness established the fact that the pipes had been there a long time.

Defendant's employees who made the test on October 1 testified that the leakage was 120.1 cubic feet per hour. The fact there was a leakage there was reported to defendant's district manager, but he did not remember the specific figure and had no record of it. He testified, however, that inasmuch as the old gas main was made of short-length sections, and there being about forty-five connections in the block, counting the street, it quite likely was leaking at the joints; that to repair each of the joints perhaps would be as expensive as the laying of a new main; that the officers of the company considered how best to handle it, and that because of the leakage and because of the fact that they needed a larger main to supply users of gas, they concluded to put in a new six-inch main. Plans for that had to be determined and they got started with the work about Third street in November; that they were delayed somewhat by bad weather and other conditions beyond their control and reached the point in front of plaintiff's place of business late in December, and had completed the line past plaintiff's place of business a few days before the explosion, but that the gas in the old line was not cut off until the afternoon of January 2, 1941; that "conditions along there, Shawnee street for some time had given us serious concern." There was testimony on defendant's behalf that the natural gas in the main was lighter than air, its weight varying from

fifty-eight to seventy percent of air, and that the natural tendency of the gas which leaked from the main would be to rise upward; that Shawnee street was paved with brick on a sand foundation, with sand between the bricks, and that it would be natural to expect most of it to reach the surface of the street through the pavement; that in fact the gas, with some pressure as it came out of the main, would seek the place of least resistance, and if prevented from going upward it was possible that it might get into the basement of a nearby building. It may be noted that defendant at the trial practically abandoned the defense pleaded, namely, that there had been no leakage; that tests of its main were frequently made and no leakage found. In fact it conceded there had been the leakage which was found when it made the test on October 1, 1940, of 120.1 cubic feet per hour. There were witnesses on behalf of defendant who testified that leakage for a block would not be regarded as excessive. Defendant, by two expert witnesses, one of whom examined the premises on January 7, 1941, and the other one on January 5, 1941, testified they found that an explosion had occurred, followed by fire, which had been put out, and that considerable damage had resulted. Neither of them was able to find the cause of the explosion. One of them suggested that it might have been sewer gas, but he had made no examination of the sewer connections and was unable to state any specific cause of the explosion. Both of them criticized the method used by Professor Allen in making his tests. They said there were later and more accurate methods of making the tests, and questioned the accuracy of the tests he made. Other matters in the evidence might be mentioned. Upon the whole the evidence of the defendant pertaining to the cause of the explosion or the likelihood that it was caused by natural gas which escaped from its line presented no more than a controverted issue for the determination of the triers of fact. We think the evidence on plaintiff's behalf, supplemented in part by some of the evidence offered by defendant, not only justified the overruling of the demurrer, but was sufficient to sustain the judgment for plaintiff. Answering special questions, the jury allowed plaintiff $5,775 for damages to his personal property, $5,837 for damages to his real estate, and $2,083 for injuries to his person.

Other special questions submitted to the jury and their answers are as follows:

"1. If you find for the plaintiff state in detail the act or acts of negligence

which you find the defendant was guilty of. A. The fact that the Kansas Electric Power Company knew that a dangerous gas was leaking and having fine apparatus for testing the building and basements adjoining the gas main on Shawnee Street, did nothing to ascertain the presence of said natural gas, which constituted negligence on their part.

"2. If you find that the explosion which occurred in the defendant's basement was caused by natural gas, state, if you know, how said gas got into the basement. A. We do not know.

. . . . . . . . . . . . . . .

"6. What was the cause of the explosion in the basement of plaintiff's building? A. Natural gas.

"7. Prior to the explosion and in time to notify defendant, did plaintiff have any reason to believe that gas was escaping in his building? A. Yes, but not in time to notify the Kansas Electric Power Co.

"8. Did plaintiff at any time make any report or complaint to the defendant that gas was escaping in his building? A. Attempted to make a report.

"9. Did the defendant prior to October 1st, 1940 have any notice of the escape or leakage of gas from its main on Shawnee Street between Fifth and Sixth Streets? A. Not to our knowledge.

. . . . . . . . . . . . . . .

"11. Did the defendant subsequent to October 1st, 1940 and prior to January 1st, 1941 have any notice of the escape or leakage of gas from its main on Shawnee Street between 5th & 6th other than the test made by its employees on October 1st, 1941? A. Not to our knowledge.

"12. Did the defendant subsequent to October 1st, 1940 proceed promptly and diligently with the construction of a new gas main on Shawnee Street between 5th & 6th Streets? A. Yes.

"13. Was such new main on Shawnee Street between 5th & 6th Streets completed with a reasonable time? A. Yes."

Defendant moved to set aside the answers to questions 1 and 6 for the reason that said answers were contrary to the evidence. Without restating the evidence bearing upon these questions we think it can be fairly said that the answer to each of them was sustained by the evidence. Defendant criticizes the form of the answer to question 1. We first note that there was no request for the jury to reconsider their answer to that question, and that the negligence found is in substance that pleaded by the plaintiff, hence the objection to it is not well taken.

Also defendant's evidence disclosed that it has an instrument spoken of as a combustible gas indicator, which it could take into a room and make an accurate test of whether there was any combustible gas present. This has not been used to test the presence of gas in plaintiff's place of business at any time after the discovery of the amount of leakage of the gas mains on October 1 and prior to the explosion.

Referring to the answer to special question 2, "We do not know," appellant correctly points out that under our decisions (see *Haley v. Kansas City Public Ser. Co.*, 154 Kan. 477, 119 P. 2d 449, and authorities there cited) such an answer is to be construed against the party upon whom rests the burden of proof with respect to the matter to which the question relates. In this case upon whom rested the burden of proof of just how the "gas got into the basement"? Plaintiff had not assumed that duty in his petition. It is true he furnished evidence of one particular place where the gas could and probably did get into the basement in sufficient quantities to cause the explosion, but there was a crack in the west wall in the basement not far from the north end which may have been there prior to the explosion and through which gas might have entered the basement. There may have been other places disclosed by the evidence. More than that, the question may be regarded as having called upon the jury to trace the movement of the gas from the time it escaped from defendant's gas main until it got in the basement. The only testimony bearing on that, and much of it from defendant's witnesses, was that the gas would move through the places where it had the least resistance. Just where it would so move defendant had as much knowledge as plaintiff.

Plaintiff criticizes the answers to questions 7 and 8. They accord with plaintiff's testimony. It is true defendant introduced evidence tending to impeach plaintiff on this point. In answering these questions the jury chose to believe plaintiff's testimony rather than that which tended to defeat it, and there is nothing this court can do about it.

Appellant points to the answer to questions 9 and 11 as indicating a lack of knowledge of defendant of gas escaping from its mains between the dates of October 1, 1940, and January 1, 1941. We think these answers go no further than to establish that there was no evidence that defendant made any tests between those dates to determine the extent of the leaking of the gas from its mains. It is not a finding that the gas ceased to leak from the main as soon as the test of October 1 was completed. Indeed, no one suggests that it did.

Appellant also points to the answers to questions 12 and 13 to the effect that defendant used due diligence subsequent to October 1, 1940, in constructing a new gas main.

It is noted that appellant's motion for a judgment in its favor

notwithstanding the general verdict was upon the ground and for the reason "that the special findings of the jury showed that said appellant was entitled to judgment." There was no direct contention in the motion that the answers to the special questions were inconsistent with each other, or that they were inconsistent with the general verdict, although perhaps those thoughts may be embodied in the motion as worded. Examining the questions, however, we find nothing inconsistent with them, nor do we find that they are inconsistent with the general verdict. In that situation, of course they do not entitle appellant to judgment. The rule is well settled that the answers to special questions must be construed so as to harmonize with each other and with the general verdict, if that reasonably can be done. (See *Dick's Transfer Co. v. Miller,* 154 Kan. 574, 119 P. 2d 454, and cases there cited.) It is only "When the special finding of facts is inconsistent with the general verdict, the former controls the latter." (G. S. 1935, 60-2918, and see *Taggart v. Yellow Cab Co. of Wichita,* 156 Kan. 88, 94, 131 P. 2d 924, and authorities cited.)

Appellant contends the court erred in the admission of testimony. This relates to the question of insurance and will be considered later. And also erred in the giving and refusing to give certain instructions. We have examined the instructions requested and those given and are of the opinion that the pertinent and proper instructions requested were included in those given. We think there would be no purpose in setting them out and discussing them at length. The instructions given are certainly as favorable to the defendant as it was entitled to receive.

Appellant propounds the question whether plaintiff is entitled to recover for property damages for which he had been reimbursed by insurance, and complains that the court erred in its ruling on the admission of testimony respecting insurance. As previously stated, the defendant in its answer alleged that plaintiff's property was insured for a stated sum; that he presented proofs of loss to the insurance companies and was paid a stated sum, for which he gave the insurance companies receipts and instruments subrogating the insurance companies to his rights for the amount paid. Defendant offered no evidence in support of those allegations. Defendant's counsel did ask plaintiff on cross-examination some questions which brought out the amount of insurance, but objections to further questions respecting it were sustained on the ground they were not

proper cross-examination. The ruling, of course, was correct. Perhaps there was an attempt to cross-examine some other witnesses respecting the insurance, where a similar ruling was made. An adjuster for insurance companies gave testimony which among other things was to the effect that the loss, as he estimated it, was about $2,000 more than the aggregate of the insurance policies. That was about the extent of the evidence relating to insurance.

In its instructions the court took from the jury the question of insurance. We think that was proper. There is no question raised here about the plaintiff's right to maintain this action by reason of the fact that he had been paid insurance. Upon the question of whether plaintiff should recover damages for the loss of property for which he had been reimbursed by insurance, the general rule applicable is that a tort-feasor is not entitled to have damages caused by him reduced because the person whom he injured by his tort had insurance. The question which sometimes arises is whether the person injured by the tort of another, or his insurer, should bring the action. But, as previously stated, that question is not presented in this case.

Finally, appellant argues that the jury gave plaintiff too much for his personal injuries. Plaintiff's testimony was to the effect that he was thrown by the explosion into the air and fell on the floor, was bruised in several places; that a dormant hernia was aggravated, and that he had not fully recovered from these injuries. His testimony was supported by his family physician. There was no medical evidence to the contrary. We know the difficulty of estimating the amount of damages one sustains by such injuries. The jury and trial court were in much better position to do that than we are. We are unable to say that the amount allowed on this item was excessive.

This action was important to both litigants. The record indicates counsel for each of them prepared and tried the case in the court below with commendable thoroughness and vigor. In this court every point has been well briefed. After all, the record presents nothing more serious than controverted questions of fact, and in view of some of the testimony of plaintiff's property loss defendant may well rejoice that the verdict was not much larger.

Defendant's motion for a new trial presented nothing which has not previously been discussed. We find no error in the record. The judgment of the court below is affrmed.

THIELE, J., not sitting.